**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Y & S TECHNOLOGIES, INC., <br> 383 Kingston Ave., Suite 357 <br> Brooklyn, NY 11213, <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES SMALL BUSINESS ADMINISTRATION; and <br> MARIA CONTRERAS-SWEET, in her <br>   Official Capacity as Administrator of the <br>   Small Business Administration, <br> 409 3rd Street, SW <br> Washington, DC 20416, <br><br> *Defendant*. | Case No. _____ |

## COMPLAINT

Plaintiff, Y & S Technologies, Inc. ("Y & S" or the "Company"), by and through counsel, hereby alleges and states as follows:

### INTRODUCTION

1.　Plaintiff brings this action to challenge the Small Business Administration's ("SBA" or the "Agency") denial of Plaintiff's application to the SBA 8(a) Business Development program ("8(a) BD"), a U.S. Government program authorized by Congress. In denying the application of Y & S, the SBA incorrectly determined that Plaintiff failed to demonstrate social disadvantage within the rules and regulations established in the Code of Federal Regulations. As set forth in this Complaint, the SBA's denial of Y & S for participation

1

in the 8(a) BD program was founded on findings and conclusions that were arbitrary, capricious, and contrary to law.

## PARTIES

2.  Plaintiff, Y & S Technologies, is based and maintains its principal place of business in Brooklyn, New York. The Company is unconditionally owned by its President, Mr. Stewart Finck.

3.  Defendant, Small Business Administration, is an independent agency of the United States of America.

4.  Defendant, Maria Contreras-Sweet, is the current Administrator of the Small Business Administration. Administrator Contreras-Sweet is named in this action only in her official capacity as Administrator.

## JURISDICTION AND VENUE

5.  This is an action seeking a Declaratory Judgment and an Injunction. It concerns actions taken by the Small Business Administration under the Small Business Act (15 U.S.C. §§ 631, *et seq.*) and various regulations issued pursuant to that Act (13 C.F.R. §§ 124.1, *et seq.*).

6.  This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331(a), as the action arises under the Small Business Act, specifically 15 U.S.C. § 634(b)(1). The relief sought herein is authorized by that statute, as well as by the Declaratory Judgment Act (28 U.S.C. §§ 2201, 2202) and the Administrative Procedure Act (5 U.S.C. §§ 500, *et seq.*).

7.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

8. Y & S submitted an application to participate in the SBA 8(a) Business Development Program, which was denied on August 27, 2012. Exhibit 1. On October 11, 2012, Y & S timely requested reconsideration of the SBA's denial of admission. On May 7, 2013, SBA issued a letter to Y & S stating that the Agency had reviewed the reconsideration request and determined that Y & S still did not meet the social disadvantage requirements provided by the applicable regulations. Exhibit 2. Y & S filed a timely appeal of the SBA's decision, which was assigned to an Administrative Law Judge for the SBA Office of Hearings and Appeals ("OHA"). OHA denied Y & S' appeal and affirmed the SBA's determination on October 25, 2013, in a "Final Decision and Order." Exhibit 3. There are no additional administrative remedies.

**BACKGROUND**

9. Defendant, the Small Business Administration, is responsible for the administration of the 8(a) Business Development Program. 13 C.F.R. §§ 124.1, *et seq*.

10. The purpose of the 8(a) Business Development Program is to provide technical, managerial, financial, and procurement assistance to economically and socially disadvantaged businesses so that they may gain competitive access to the American economy. *See* 13 C.F.R. § 124.404.

11. Requirements for admission to the 8(a) BD program are that the small business applicant be unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and are United States citizens residing in the United States. The small business must also demonstrate potential for success. 13 C.F.R. § 124.101.

12. "Socially disadvantaged individuals" are defined by the SBA as individuals "who have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups and without regard to their individual qualities." The social disadvantage "must stem from circumstances beyond their control." 13 C.F.R. § 124.103.

13. Individuals who are not "members of designated groups" that are presumed socially disadvantaged pursuant to 13 C.F.R. § 124.103(b)(1) must establish "individual social disadvantage" by a preponderance of the evidence. 13 C.F.R. § 124.103(c).

14. Pursuant to 13 C.F.R. § 124.103(c)(2) an individual who is not presumed socially disadvantaged must provide evidence of the following:

> (i) At least one objective distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged;
>
> (ii) Personal experiences of substantial and chronic social disadvantage in American society, not in other countries; and
>
> (iii) Negative impact on entry into or advancement in the business world because of the disadvantage. SBA will consider any relevant evidence in assessing this element. In every case, however, SBA will consider education, employment and business history, where applicable, to see if the totality of circumstances shows disadvantage in entering into or advancing in the business world.

13 C.F.R. § 124.103(c)(2)(i-iii)

15. The evidence supplied by an individual to meet these criteria "is sufficiently detailed if it describes (1) when and where the incident occurred, (2) who discriminated, (3) how the discrimination took place, and (4) how the applicant was adversely affected by the discrimination." *Unicon, Inc.*, SBA No. BDP-428 (Mar. 12, 2012) (quoting *Seacoast Asphalt Servs., Inc.*, SBA No. SDBA-151 (June 29, 2001)).

16. The SBA must "provide cogent reasons for denying the claim of social disadvantage. It may not arbitrarily disbelieve credible evidence." *Timely Eng'g Soil Tests, LLC*, SBA No. BDP-297 (2008); *Bitstreams, Inc.*, SBA No. BDP-122 (1999) (citing *Office of Workers' Compensation Programs v. Collieries*, 512 U.S. 267, 279 (1994)).

## FACTUAL ALLEGATIONS

17. In the October 11, 2012, request for reconsideration of its application to the SBA 8(a) BD program, Y & S, by and through its President, Mr. Finck, submitted more than 130 pages of evidence to support his social disadvantage narrative ("SDN").

18. The Administrative Record ("AR") compiled and reviewed by the SBA in reaching its determination that Plaintiff did not qualify as a socially disadvantaged individual included Mr. Finck's statement that in 1976 he converted from secular Judaism to Chassidic Judaism while a student at Ohio State University.

19. Since converting in 1976 Mr. Finck has been an observant Chassidic Jew.

20. Because of his Chassidic Jewish faith, Mr. Finck's physical appearance led to ridicule, harassment, and shunning by the university community.

21. Chassidic businesses owned and controlled by socially and economically disadvantaged persons are eligible to participate in the 8(a) BD program. *Med-Choice, Inc.* SBA No. SDBA-179 (2008) (citing Hasidic Jewish Americans, Decision on Request for Group Designation, 45 Fed. Reg. 25,563 (Apr. 9, 2008)); *In the Matter of Tenco Enterprises, Inc.*, SBA No. 425, 1993 WL 566035 (1993).

### A. CHRONIC AND SUBSTANTIAL BIAS IN EDUCATIONAL PURSUITS

22. Mr. Finck was denied reasonable accommodations for his religious observance of days of obligation, beliefs, and the practices of his faith by the university he attended.

23. Mr. Finck's academic performance suffered as a result of the university community's unwillingness to make reasonable accommodations when he missed classes, tests, or study group sessions. He was not given alternative options to pursue the same opportunities he would have had if not for his Chassidic Jewish beliefs and practices.

24. The university's professors and administrators refused to comply with Mr. Finck's religious needs or to make alternative accommodations when conflicts arose.

25. In response to evidence presented by Y & S, the SBA declared in its "Final Decision and Order" of October 25, 2013 (Exhibit 3, p.12) that Mr. Finck "had not provided examples of biased comments, behavior, exclusion, or denial of access, but rather evidence as to the refusal on the part of students and professors to adopt his requested accommodations." *Y & S Technologies, Inc.*, SBA No. BDPE-507 (2013). The "Final Decision and Order" "agreed" with the SBA's contention that "the differing treatment . . . was a reaction toward [his] change toward [his] fellow students and professors as opposed to biased treatment on their part." Exhibit 3, p. 10.

26. This SBA determination was arbitrary, capricious, and contrary to law because "the SBA must look at the incidents of discrimination submitted from the view of the applicant, not the alleged offender, to determine if the incidents evidence social disadvantage." *Med-Choice, Inc.* SBA No. SDBA-179 (2008) (citing *Tenco Enterprises, Inc.*, SBA No. MSB-425 (1993)). Mr. Finck's narrative amply proved that professors and students were biased against him on account of his Chassidic Jewish beliefs, observances, and appearance.

27. Mr. Finck's substantial presentation of demonstrated social disadvantage in his educational pursuits amply satisfied the correct legal standard and was arbitrarily and capriciously rejected by the SBA contrary to law.

28. The SBA's conclusion that the social disadvantages which Mr. Finck experienced as a result of the unwillingness of professors and students to make reasonable accommodations to his religious observance was his own doing because he converted to Chassidic Judaism is arbitrary, capricious, and contrary to law. Such a conclusion forces Mr. Finck to violate his faithful religious practice in matters outside his control in order to meet his academic obligations. This conflicts with 13 C.F.R. § 124.103.

29. The SBA arbitrarily and capriciously determined that Mr. Finck's showing of bias by professors and students with whom he interacted between the time of his religious conversion in 1976 and his graduation from Ohio State University and the effect that such bias had on his academic performance and general participation in the university experience failed to satisfy the legal standard provided by *Unicon, Inc.*, SBA No. BDP-428 (2012).

### B. CHRONIC AND SUBSTANTIAL BIAS IN EMPLOYMENT HISTORY

30. Upon graduating with a degree in economics and marketing, Mr. Finck was unable to obtain gainful employment at financial institutions and commercial companies following many job interviews over several years. Jobs were denied to him because of his Chassidic appearance (beard, earlocks, tzitzis) and his conservative Chassidic dress.

31. When he was granted interviews for open positions, Mr. Finck's conservative Chassidic appearance and dress was unfavorably received by prospective employers. They often stated that the position Mr. Finck was asked to interview for was filled or was no longer available.

32. Mr. Finck attempted to adapt to the discriminatory treatment he experienced in his job search by seeking a banking position in a Chassidic neighborhood. Mr. Finck was turned down by all of the banks that he interviewed with, and he was "told clearly that [his] dress code

was not conducive to the accepted banking image." Exhibit 3, p. 17. Even in predominantly Chassidic neighborhoods banks did not employ Jews who dressed in conservative Chassidic clothes.

33. The SBA arbitrarily, capriciously, and contrary to law rejected what Mr. Finck was "told clearly" and disregarded his inability to secure employment at banks on the erroneous ground that he did not "describe any specific instance in which a comment or action was made regarding Mr. Finck's dress code during his attempts to procure employment with these banks." Exhibit 3, p. 17.

34. Failing to find work in the financial services industry, Mr. Finck was forced to seek employment in other fields, including sales, retail, and management.

### C. BUSINESS HISTORY OF CHRONIC AND SUBSTANTIAL BIAS

35. While employed as a salesman for 47th Street Photo, a reseller of IT products, Mr. Finck experienced several specific instances of bias and discrimination because of his Chassidic Jewish appearance and dress. Throughout the consideration of Y & S' application, Mr. Finck provided the SBA with specific detail regarding these instances of bias and discrimination.

36. For example, in the course of selling to Manufacturer Hanover Bank ("Manufacturer"), Mr. Finck was told that Manufacturer made significant effort to buy from minority-owned companies.  When Mr. Finck explained that Chassidic Jews were subject to minority-owned status, Manufacturer's purchasing agent "ranted" that "she buys from minorities, but not Jewish-owned companies."  SBA's "Final Decision and Order"declared arbitrarily, capriciously, and contrary to law that "Mr. Finck's statements regarding the woman's view towards Jews appeared to be conclusory." Exhibit 3, p. 16. In fact, Mr. Finck's statements quoted the purchasing agent's remarks.

8

37. Mr. Finck detailed another similar experience with Revlon, at the company's corporate headquarters in Edison, New Jersey. Mr. Finck obtained an opportunity to sell a "clone computer" to Revlon, which the company had previously tested and was considering purchasing for use nationwide. When Mr. Finck arrived for his appointment in his Chassidic dress, he was given the "cold shoulder and an excuse that there were other brand units they needed to test and they would get back to [him]." Revlon awarded the contract to another firm, which resulted in the loss of several hundred thousand dollars in contract revenue for 47th Street Photo. The SBA in its "Final Decision and Order" asserted arbitrarily, capriciously, and contrary to law that it was "not clear as to whether Mr. Finck had an opportunity to present to Revlon or 'how the actual purchase decision was made, i.e., direct award, bid, etc.'" Exhibit 3, p. 16. Mr. Finck stated clearly that he had "presented" to Revlon, and the form of the "purchase decision" was irrelevant because the denial was biased.

38. Another specific instance of bias and discrimination involved BMG, a German company. Mr. Finck had an established business relationship with RCA and RCA's purchasing agent. When RCA was acquired by BMG, the relationship ceased. During frequent phone calls and personal visits Mr. Finck noticed a "complete change in [the purchasing agent's] attitude towards [Mr. Finck]." The purchasing agent eventually explained to Mr. Finck that BMG was "a very German company" and that the purchasing agent, a secular Jew, "was surprised that he…still had a job there." The purchasing agent further elaborated that to keep his own job, he had to stop purchasing any more electronic or computer items from 47th Street Photo. The termination of this existing sales relationship resulted in a loss of roughly $50,000 in annual revenue for Mr. Finck and 47th Street Photo. The SBA arbitrarily, capriciously, and contrary to law dismissed this evidence of bias on the stated ground that "the assertions as to the incident

with BMG did not explain how Mr. Finck was negatively impacted by the failed relationship." Exhibit 3, p. 16. The termination of the RCA relationship had an obvious "negative impact."

39. Another instance of bias based on his Chassidic Jewish identity was provided to SBA by Mr. Finck regarding his employment at 47th Street Photo. Mr. Finck maintained a supplier relationship with the respective Information Technology ("IT") Directors of Paine Webber and Chase, Bob Merzulle and Fred Winograd. Relying on the capabilities of 47th Street Photo, a company with hundreds of millions of dollars in sales, Mr. Finck sought to expand this business relationship by seeking to compete on larger contracts for Paine Webber's and Chase's major purchases. Mr. Finck was initially denied this opportunity based on the IT Director's subjective conclusion that the 47th Street Photo was not big enough to supply the needs of these companies. When Mr. Finck persisted in attempts to win a big contract - or even to compete for the opportunity to win such a contract - the IT Directors at Paine Webber and Chase told Mr. Finck that he would have to accompany them to "bars and/or gentlemen's clubs." Attendance at such establishments is prohibited by Mr. Finck's religious beliefs and practice. Mr. Finck's religious convictions thereby effectively foreclosed him from competing for this business opportunity.

40. The SBA asserted erroneously that because Paine Webber and Chase did *some* business with 47th Street Photo, it negated the specific instance of bias that Mr. Finck experienced in attempting to win a larger, more valuable, contract than 47th Street Photo had previously held with Paine Webber and Chase. *See Tony Vacca Constr., Inc, Petitioner*, SBA No. BDP-321 (May 13, 2009). The SBA arbitrarily, capriciously, and contrary to law asserted in its "Final Decision and Order" that "it was not unreasonable for SBA to conclude that Paine Webber and Chase Manhattan Bank may have elected not to work with 47th Street Photo on

contracts for major purchases for reasons other than bias." Exhibit 3, p. 16. The IT Directors were surely aware that a large supply contract would provide to Mr. Finck and/or 47th Street Photo much greater value than the computer peripherals and miscellaneous computer products contracts which they previously purchased from 47th Street Photo. Yet they refused to consider such a possibility unless Mr. Finck visited locations that were prohibited by his religious beliefs and observances.

      41.    The SBA arbitrarily, capriciously, and contrary to law concluded that bars and gentleman's clubs were merely "social setting[s]" that Mr. Finck voluntarily did not attend. The SBA's "Final Decision and Order" erroneously declared that "the fact that business was conducted in a manner in which Mr. Finck could not partake was not in and of itself indicative of bias." Exhibit 3, p. 14. The required "social setting" venues were contrary to Mr. Finck's religious observance. *See Med-Choice, Inc*. SBA No. SDBA-179 (2008) (citing *Tenco Enterprises, Inc.*, SBA No. MSB-425 (1993)).

      42.    Mr. Finck's application to the 8(a) BD program also detailed his experience in seeking to obtain an Extron dealership. During the course of his sales efforts, Mr. Finck sought to meet with Extron's regional sales manager, Ms. Laterneau. Ms. Laterneau repeatedly denied Mr. Finck the opportunity to meet. Another Extron employee stated that Ms. Laterneau did not trust Mr. Finck. She said he looked like "Santa Claus" and suggested to this employee that Mr. Finck would ruin Extron's name.

      43.    Mr. Finck described that after Y & S finally obtained Extron dealer status, it received substandard support from Ms. Laterneau's department. Mr. Finck also noted his discovery that another identified Chassidic-owned firm, B & H Photo, had its dealership status revoked under Ms. Laterneau's authority.

11

44. Ms. Laterneau's substantial and chronic bias over several years conducted against Y & S and other identified Chassidic-owned firms clearly demonstrated biased treatment that negatively impacted Y & S' entry or advancement in the business world. The SBA arbitrarily, capriciously, and contrary to law asserted that since Y & S "ultimately did receive the sought after dealership with the company," it "did not demonstrate with a sufficient level of detail that the company had been subjected to biased treatment which negatively impacted entry or advancement in the business world." Exhibit 3, p. 21. Mr. Finck had described the "substandard support" that Ms. Laterneau provided.

45. Mr. Finck's 8(a) application also described how anti-Semitism had played a role in a Chicago venture capital firm's last-second decision to abandon a proposed deal without explanation. Because the SBA was unable to definitively corroborate Mr. Finck's assertion of anti-Semitism from the lawyer Mr. Finck was working with at that time, it determined erroneously that "it is not unusual for such deals to fail because of the lack of enthusiasm and/or trust in the designated manager or management team." Exhibit 3, p. 22. The SBA's "Final Decision and Order" also arbitrarily, capriciously, and contrary to law mischaracterized a statement from the lawyer with whom Mr. Finck was working as "unsure as to whether anti-Semitism played heavily in the decision." Exhibit 3, p. 22. This determination by the SBA failed to address the strong bias, discrimination, and likely anti-Semitism that probably contributed to the venture capitalist's lack of enthusiasm and/or trust in Mr. Finck.

46. Another instance of anti-Chassidic bias presented by Mr. Finck concerned M&M Computer's competitive bid submitted in 1997 to service the computers and peripherals of the New York City Finance Division. Mr. Finck owned M&M Computers between 1995 and 2009. Mr. Finck was informed in 1997 that M&M was the low bidder for a multi-year contract, which

represented upwards of $100,000 in profits to M&M. Mr. Finck was asked to meet with the organization's IT Director. Because of his prior experience resulting from his religious dress, Mr. Finck felt compelled to modify the conservative dress dictated by his religion and wear a tie for his meeting with the IT Director.

47. When Mr. Finck met with Finance Division IT Director, the organization's previous interest in M&M's low bid was overshadowed by expressed concerns about the company's practical capabilities. The IT Director expressed concern over Mr. Finck's ability as a Chassidic Jew to be "on call" by phone or beeper on Saturdays (during the Shabbos) and on other days of religious obligation. Mr. Finck explained that his personal availability would not affect the service or capabilities provided by contracting with M&M because he was not the servicing technician. He stated that M&M had adequate personnel resources, and he would ensure that proper contingencies for additional technicians were available.

48. M&M was not awarded the contract because the IT Director believed that Mr. Finck's personal religious observance would interfere with M&M's ability to fulfill the contract. The bias against Mr. Finck that resulted in loss of this contract was corroborated by an affidavit submitted by an M&M employee who vividly recounted Mr. Finck's return from this meeting when he informed the employee that the contract was lost because of Mr. Finck's Chassidic Jewish observances.

49. The SBA arbitrarily, capriciously and contrary to law denied that this experience with the Finance Division contributed to Mr. Finck's experience of chronic and substantial bias. The SBA's "Final Decision and Order" stated arbitrarily, capriciously, and contrary to law that "the record did not support by a preponderance of the evidence that the denial of this contract was due to biases directed at Mr. Finck because of his religion and/or appearance. Instead, it

appeared the city was concerned about potential unavailability." Exhibit 3, p. 23. The IT Director explicitly stated that the cause for rejecting M&M's bid was Mr. Finck's religious practice. *See* 13 C.F.R. 124.103(c)(2)(iii)(C) (the "SBA considers such factors as… unequal treatment in opportunities for government contracts or other work, unequal treatment by potential customers and business associates, and exclusion from business"). Mr. Finck's availability as President of M&M was not needed to faithfully and effectively execute the service contract. Nor did the Finance Division IT Director suggest that other bidders had offered that their presidents would be available 24/7. It is clear from this incident that it was Mr. Finck's religious practice that resulted in denial of the contract to M&M even though M&M was fully capable of performing the contract.

50. Another illustration of bias based on his Chassidic Jewish appearance and dress occurred in the fall of 2004. Mr. Finck was asked to appear in a representative capacity for M&M at the Bank of New York for an audit. When he arrived at the bank, he was taken to a conference room and interrogated by a female auditor who accused Mr. Finck of illegal money laundering and criminal activity without asking for details or proof of a transaction. The same auditor then intimated that Chassidic Jews were not considered straight business people. Mr. Finck explained that the wire transfer in question was a one-time legal transaction. The bank nonetheless informed Mr. Finck that he had 90 days to close his account. This resulted in Mr. Finck's loss of a $50,000 line of credit.

51. The SBA acknowledged in its "Final Decision and Order" that the auditor's attitude may have been "inappropriate," but arbitrarily, capriciously, and contrary to law concluded that the bias and discrimination experienced by Mr. Finck in dealing with the Bank of New York did not demonstrate social disadvantage  because "it was not unreasonable for the

14

bank to have concerns regarding the transaction, noting that the movement of a large sum of money through a business account and not generated through normal business activities would generally raise concern." Exhibit 3, p. 21.  This speculation regarding the bank's motive, contradicted by the facts reported by Mr. Finck, is not a ground to reject evidence of discriminatory treatment and social disadvantage. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Ace Technical, LLC*, SBA No. SDBA-178 (Apr. 17, 2008).

52. The loss of an existing $50,000 line of credit based on a false and unsubstantiated accusation that Mr. Finck is unethical as a result of his appearance, dress, and observance of Chassidic Judaism clearly evidenced biased treatment that negatively impacted Mr. Finck's entry or advancement in the business world.

53. The SBA acted arbitrarily, capriciously and contrary to law by ignoring the extensive history of demonstrated bias against Mr. Finck because of his Chassidic identity.  The SBA's arbitrary disregard of many individual incidents of bias was contrary to law because such incidents substantiate claims of bias that the SBA has credited in other circumstances. *See Tony Vacca Constr., Inc, Petitioner*, SBA No. BDP-321 (May 13, 2009). "[B]ias need not be established with exactitude," only proved by a preponderance-of-evidence standard. *Id.*

54. Another incident of anti-Chassidic bias reported by Mr. Finck occurred in 2011, and involved Castle Pines.  Y & S was denied a $250,000 line of credit because of Mr. Finck's religious practice.  Mr. Finck provided details of the credit application process, which included positive feedback from the lender's representative indicating that Y & S would receive the line of credit. Mr. Finck  reported that he had sought to avoid  the anticipated adverse response to his religious dress  by sending his son, who is not Chassidic, to first meet with the lender.  When Mr.

Finck and his son thereafter met together with the lender, they observed a distinctly cold reception to Mr. Finck's appearance. This had not been perceived prior to Mr. Finck's physical presence. Y & S was subsequently denied the line of credit.

55. The SBA determined arbitrarily, capriciously, and contrary to law that "this claim lacked a sufficient level of detail to allow SBA to evaluate the claim and did not describe how this denial negatively impacted entry or advancement in the business world." Exhibit 3, p. 24. This SBA determination was patently erroneous. *See* 13 C.F.R. 124.103(c)(2)(iii)(C) (the "SBA considers such factors as unequal access to credit or capital, acquisition of credit or capital under commercially unfavorable circumstances").

56. Mr. Finck's Request for Reconsideration had reported that Y & S requires approximately $400,000 to $500,000 in financing capacity to maintain current product turnover and achieve reasonable growth. Mr. Finck stated that at the time of Y & S' application for a credit line from Castle Pines, Y & S maintained a $150,000 line of credit in "excellent" standing. Adding the requested Castle Pine credit line would have satisfied the operational financing needs of Y & S as presented to the SBA by Mr. Finck. The SBA is obliged by law to accept this representation as true absent a cogent reason for disbelieving it. *See Timely Eng'g Soil Tests, LLC*, SBA No. BDP-297 (2008); *Bitstreams, Inc.*, SBA No. BDP-122 (1999). Hence SBA's determination that there was no negative impact from denial of the credit line was arbitrary, capricious, and contrary to law.

57. The SBA's assertion that Mr. Finck's allegations were not adequately detailed as they pertained to the Castle Pines incident was arbitrary, capricious, and contrary to law. Mr. Finck's presentation of when and where the incident took place, who discriminated against him, how the discrimination occurred, and the clear adverse impact the incident of discrimination on

Mr. Finck and Y & S was extraordinarily detailed and had to be accepted by the SBA. *See Unicon, Inc.*, SBA No. BDP-428 (Mar. 12, 2012).

58. The SBA arbitrarily, capriciously, and contrary to law minimized the probative value of a letter in which Mr. Finck's son described that he freely conversed with a Samsung representative at a Samsung booth and then saw the Samsung representative become uncomfortable and distant when Mr. Finck, in his Chassidic appearance and dress, was introduced as the president of Y & S. In its "Final Decision and Order" the SBA acknowledged that "Mr. Finck had demonstrated biased treatment and a negative impact by a preponderance of the evidence" (Exhibit 3, p. 21), but it failed to accord weight to this conclusion. This incident further established the actual discrimination suffered by Mr. Finck over several years on account of his Chassidic Jewish identity and distinguishing features. *See Boblits Servs., LLC*, SBA No. BDPE-480, 2013 (Apr. 1, 2013) (citing *Ace Technical*, SBA No. SDBA-178, at 3); *see also Seacoast Asphalt Servs., Inc.,* SBA No. SDBA-151 (June 29, 2001).

59. The SBA's rejection of Y & S' demonstration of chronic and substantial bias against Mr. Finck because of his Chassidic Jewish appearance, dress, and beliefs was arbitrary, capricious and contrary to law.

60. The SBA's determination that Mr. Finck insufficiently proved that he experienced bias in his business history was arbitrary, capricious and contrary to law because it violated the preponderance-of-evidence standard which applies to such applications. *See* 13 C.F.R. § 124.103(c)(1); *see also Bitstreams, Inc.*, SBA No. BDP-122 (July 2, 1999) ("[a]s long as the scales tip, however slightly, in favor of the party with this burden of proof, then that fact will have been proven").

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff seeks relief by this court as follows:

1. A declaration that the actions, findings, and conclusions of the SBA regarding the Y & S application for 8(a) Business Development status were arbitrary, capricious, and contrary to law;

2. A declaration that Y & S is eligible for 8(a) Business Development status;

3. An injunction directing the SBA to recognize Y & S as qualified under the 8(a) Business Development program;

4. Remand of the Y & S application to the SBA's 8(a) Business Development Program for action consistent with the above declaratory judgments and injunction;

5. Award of attorneys' fees to Plaintiff pursuant to the Equal Access to Justice Act, 28 U.S.C § 2412, or any other provision of law;

6. Such other relief as the court may deem just and proper.

Dated: March 19, 2015

Respectfully submitted,

s/Nathan Lewin
_____
NATHAN LEWIN
ALYZA D. LEWIN
LEWIN & LEWIN, LLP
888 17th Street N.W.
4th Floor
Washington, DC  20006
(202) 828-1000
nat@lewinlewin.com

*Attorneys for Plaintiff*